All right. Welcome back. Calling the final case for the day. If counsel would please come forward, let us know how much time you would like for a rebuttal. Good morning. I'd like to reserve three minutes of my time for rebuttal. That's fine. Go ahead, please. May it please the court, Elizabeth Potter on behalf of Plaintiff Appellants. This case challenges federal decisions that sacrificed treasured public lands all to benefit a rancher with a long history of noncompliance. These challenged decisions substantially expanded grazing into long-protected riparian areas that contain rare and extraordinary biodiversity. Today I want to walk through why these challenged decisions violate bedrock administrative procedures and the environmental laws at issue. So I want to turn right to the NEPA issues. The EIS really hid the ball about the substantial direct harm that the expanding grazing alternatives will have on the frog by trampling, displacing, and harassing them from ever-dwindling pools in Jack Creek. Now, this is a much bigger problem than the impacts to habitat for the frog, because as the EIS found, the population is already critically low and had less than 20 breeding females. Instead of providing... What's your best case for the argument that the agency had to specifically compare the magnitude of the threats for each alternative? So the Ilia Oluklilani Coalition v. Rumsfield case talks about, from this court, talks about how the alternatives analysis is the heart of the EIS. But I'd point this court to its decisions in the Onda v. Rose case and the Blue Mountains Biodiversity Project v. Blackwood that we cite in our briefs, because both of those cases talk about how a hard look is not taken, where an agency simply talks about possible risks of the action at issue. And so... There seems to be, you know, a continuum between not, you know, just broadly saying possible risks and asking for specific quantification across alternatives. So do you have anything where we've said that that's necessary to meet the NEPA standard? So in the Blue Mountains Biodiversity Project case, this court faulted the agency for not better addressing the estimate of sediment that would come from logging projects. And here I think it's important to look at the EIS, because the EIS devoted less than two pages to the effects of the expanding grazing alternatives, and just a single sentence that And the record here shows that the agency could and should have done more. Most notably, Fish and Wildlife Service's comments on the draft biological assessment that the agency tries to rely so heavily upon. This is in the record at...further excerpts of record at 20 to 22. The Fish and Wildlife Service explained that the agency was only starting to hint... What about the Sierra Forest legacy case, which says we apply only pragmatic judgment and may not impose upon the agency our own notion of which procedures are best, or most likely to further some vague, undefined public good. We can't mandate them to provide particular graphs, even though they're really helpful. Yes, Your Honor. So again, these NEPA cases often turn on the record at issue here. And so here, there's a single sentence in this EIS that really deals with this problem. And the record shows that the agency was aware there was more that they could do. So I'd like to point you to the declarations of Teresa Simpson, who was a long-time Forest Service biologist. These are in the record at 4ER7... Can I ask you, of your three claims, which one do you think is your strongest case? And I know you think they're all great, but do you think your NEPA claim is your strongest? Yes, Your Honor. I think the NEPA claim is the strongest. The NIFMA claim as well, I'd like to address that if you'd like to turn to that now, or would you like to... I'd prefer to turn to your Endangered Species Act claim, personally, but... Fantastic. Let's go there. So under the Endangered Species Act, the... Well, there are two real problems with the biological assessment. So the mitigation measures here, there was a serious problem in the assessment in the biop, because as we know from the long history of it has been, frankly, impossible to keep thirsty cattle out of Jack Creek during the summer in the low flows as they arise. And so here, Fish and Wildlife Service really just assumed that the low water strategy that we focus on in our briefs would be effective. And the real problem there is that the agency needed to account for the serious harm that can occur to the frog from the long history of delays that can happen from the time low flows arise and cattle are actually taken off. The concern, Friends of the Wainema case, from the district court in the prior litigation noted in 2014, it took more than a month for cattle to be, to get off and stay off in Jack Creek. And is that because of the lack of specific timing of when they're supposed to be monitoring to know when mitigation measures have to be put into place? It's for a number of reasons, Your Honor. Exactly. The low water strategy is very vague. It trusts the permittee to identify when these low flows have arisen. I mean, this is a rough and remote allotment. You know, there's no like Bluetooth monitoring of these low water, of the low water conditions. The permittee has to identify them. The agency has to be close. The low water strategy relies on closing gates, erecting fences, keeping those cattle off. And in the record, in addition to the concern, Friends of Wainema case, 5 ER 1006, this happened again in 2016 where the agency ordered cattle off of Jack Creek and it took more than a month and multiple orders for that to be successful. And this is a big deal for this frog because, I mean, both of the agencies recognize that one of the biggest threats is the trampling that happens from cattle in these pools. One of the biggest threats is that these pools are ever shrinking in the summer. And when cattle and frogs get in there, cattle can displace and harass and trample the frogs. And so that's why, you know, the days and weeks and months that can happen between the low flows arising and the cattle being taken off and successfully staying off is a big deal. And Fish and Wildlife Service just needed to be up front about this in its biological opinion. And this was such a big issue because Hypothetically, if we agreed with you that the biop had to be vacated, would the record of decision also have to be vacated? I believe so, Your Honor. Yes. I mean, if you found for us on the Endangered Species Act issue, then that biological opinion would be vacated and or we would urge you to vacate that opinion. And the record of decision should not be in place if it does not, if it's not based on a valid Endangered Species Act consultation. Would vacating the biop cause more environmental harm? Absolutely not, Your Honor. Why not? Because the biop, the biop here is what is providing take authorization for the agency and the permittee to allow these cattle in the stream year after year, where the Fish and Wildlife Service has estimated could cause several hundred of these frogs to be harmed or killed each year. Whereas without that take authorization, there would be no grazing allowed in Jack Creek. And I'd like to remind the court... One of the things that I thought the agency was arguing was that this, the project actually would help because it would spread out the grazing and they would give them some management authority on private land. So that would go away, I assume? Um, the waiver of grazing on private land, potentially? I think one of the trade-offs was that by expanding the grazing that the service would get to engage in some management practices on private land. Am I, or am I misunderstanding the record? No, you're remembering that correct, Your Honor. But I want to remind the court that in the record, the last time that cattle were authorized for grazing in Jack Creek when drought conditions arose in the early 2000s, that's when we had the substantial decline in this population. And so that's why now with climate change, the Fish and Wildlife Service's failure to analyze the additive effects of climate change on this, on this new grazing scheme was such a serious flaw. Well, the service's argument seems to be that they, although they didn't really discuss climate change, either in the baseline or in the cumulative effects analysis, they incorporated by reference the final rule listing, which did discuss climate change. So do you have a response to why that's incorporation by reference is insufficient? Absolutely. So, so here actually the listing rule provided a lot of what Fish and Wildlife Service needed to analyze climate change. So the listing rule, and I believe this is at 3 ER 492 to 93, talked about how climate change is poised to worsen low flows in snowmelt-driven systems like this. And so that information combined with the record information about how the existing flows in Jack Creek are already insufficient for the frog and that cattle are likely to make that worse. Fish and Wildlife Service just needed to connect the dots here. And it wasn't upfront about the uncertainty that it now claims here in this litigation. This makes it worse than the Center for Biological Diversity v. Zinke case that we cite in our briefs because there Fish and Wildlife Service was upfront about uncertainty being the reason why it couldn't do more. And here Fish and Wildlife Service didn't say that in the biological opinion. I really, there are only two sentences in this biop that mentioned climate change and neither of them connect those dots between the lower flows that are expected in Jack Creek and the harm that the Fish and Wildlife Service is expecting will happen to this critically low population each year. Of course, they talk about drought conditions, don't they? They do. Sort of the same, maybe a synonym for climate change. So the issue with climate change is that climate change, as Fish and Wildlife Service said in the listing rule, is poised to make lower flows, which are a condition of drought, even more, they're poised to worsen that. And so that is one of the reasons why Fish and Wildlife Service needed to really analyze this issue and be upfront in the biop. Let me ask you this. I was looking at, there's a sentence in the wildlife report and another in the site management plan. The wildlife report talks about that, quote, the minimum amount of habitat to be required to maintain an Oregon spotted frog population is about 10 acres. And then in the site management report, it says that the requirements for assessing potential habitat for Jack Creek population defined to include only those lands that are currently capable of supporting OSFs, which are the Oregon spotted frog, at hundreds of acres. So why is there a problem of an endangered species if you've got hundreds of potential acres and you only need 10? Your Honor, this population is small and isolated as the agencies have recognized, and that puts it at a high risk of extirpation. And this population is important for the species as a whole. And so that is, those are some of the reasons why it's so important that the agencies here get this right. I would, with my brief time remaining, if this is my rebuttal time. No, I'll give you two minutes for rebuttal, but if there's anything more you wanted to say in response, take the time to do it. I am interested in turning to the National Forest Management Act or NFMA issues if this court, unless this court has further questions on the Endangered Species Act issue. Go ahead. Do you want to address Judge Gilman's harmless error problem or issue with regard to the acreage here, that it's beyond what may be needed for the habitat for the OSF? Your Honor, I do not think that this is harmless error, again, because of the importance of this population and the importance of Jack Creek for this species. Well, this implies that even if Jack Creek were wiped out, there'd still be hundreds of acres of suitable population for the frogs. So the record isn't clear about what other populations exist on this forest. And so I'm not aware of the Forest Service or the Fish and Wildlife Service discussing that. The definition of jeopardy under the regulations under the ESA relevant here? My understanding is that for the ESA, jeopardy would mean for a threatened or listed species that if you reduce even one portion of the population and a minority critically endangered species, that could be considered jeopardy. I'm paraphrasing a little bit, but I think my understanding is the definition of jeopardy is quite broad under the regulations. Yes, but the biological opinion at issue here also has to assess the indirect and the direct effects of the action. And so that includes, you know, considering how effective these mitigation measures would be and how climate change is poised to make these issues much worse. Isn't it true that for the Endangered Species Act, you look at the scale of the proposed action, you don't look at the entire forest for the jeopardy action? And this wasn't an argument that the agency relied on, so they can't do post hoc rationalization. Exactly, Your Honor. And we do great caution in exercising harmless error in these circumstances? Exactly, Your Honor. And so with my brief time, I do just want to touch on the NFMA issue because of the importance of the sensitive riparian areas at issue. They can be irreparably harmed quickly and by just a few cattle. And so this is why the forest plan standards... Let me make one more observation. If the frogs can't get between various parts of the habitat because the water connectors dry up, then it really wouldn't matter the total acreage anyway, right? That's another great reason. You're right, Your Honor. And so turning to the NFMA question just briefly, the forest plan standard sets a detrimental soil condition limit of 10% or less. The allotment management plan doubles that through the annual monitoring and use standards for alteration in these areas. And the record contradicts the agency's post hoc rationalizations here. The EIS at 2ER-242 and 3ER-520, that's the hydrology report, both of those tables describe soil alteration measurements and include compaction, which is explicitly defined in the forest plan as a type of detrimental soil condition. And this is why the court should reject the agency's post hoc rationalization that these are different standards and find that the numbers just don't match up. 10% in the forest plan, 20% in the ANP, and the without... My understanding is that there was one standard is forest wide and one standard is only for this particular site or something. But there's a disconnect that you're not essentially comparing apples. You're comparing apples and oranges. So the detrimental soil condition standard, and I do not believe the agency disputes this, applies to the western pastures on this allotment, the Schmolt pasture and the North Sheep pasture and the Jack Creek pasture. And so the key areas, the key areas here that are used for where this monitoring and use standard in the ANP applies, that is used by the agency to show both short and long term effects, the effects of grazing management over the pasture unit as a whole. And this is at 2 ER 101. So in other words, the key areas that are monitored in the ANP are what the agency uses to determine compliance with that overall forest standard, the 10% or less. And this court should follow its decisions in Native Ecosystems Council v. Tidwell and Alliance for the Wild Rockies that held such an unsupported conclusion is not enough to show consistency with the forest plan under NFMA. No further questions. You're a minute and 51 over your time, but I'll give you a two-minute rebuttal. Good morning, Your Honors. May it please the Court. Assistant U.S. Attorney Sean Martin for the appellees here. The district court correctly ruled against plaintiff's claims under NEPA, NFMA, and the ESA. The district court held two oral arguments on the merits, and its opinion is well supported by the administrative records here. I would point out, before I venture into each of the statutory issues, that most of the district court's conclusions are not at issue and constitute law of the case. For example, the district court affirmed the Forest Service's judgment that there would be dispersed or diluted impacts compared to the status quo because virtually the same amount of grazing would be spread out over a much larger riparian acreage. That's at 1 ER 8 through 9. Counsel, since your time is limited, I'm going to ask you to focus on the ESA issues for the moment. My understanding is that part of the reasoning of the biological opinion is that there would be no jeopardy because of the mitigation measures for when there would be low water. Mitigation measures would be taken to prevent the cattle from grazing in the critical areas. That all does seem to hinge on someone saying, hey, there is low water. And then it also seems to me, under the project's proposal, they say we're going to have fields visits or inspections informally when opportunities arise and we'll try to have formal inspections when possible. Am I missing something about a standard or a schedule for when low water conditions would be identified? They would be identified by routine monitoring. Where in the project proposal does it say that monitoring occurs? Is there a standard or a schedule? There's not a specific set of dates that are identified in the biological opinion. Is there a standard in which someone would say, if we don't have rain for a certain amount of time, we're going to send someone to go look? I think the biologists would say the later you get into the summer, as we get into August, as we get towards September, that's where this ecosystem tends to dry out more. But there's nothing in the project proposal itself to ensure that that monitoring would take place under those conditions? Well, it's going to take place. And not just that, but it's a requirement that the Forest Service biologists report their routine visits during the grazing season to the Fish and Wildlife Service and file an annual report each March about how the previous season of grazing went with regard to the frog. I guess I did want to put a fine point on it. Is there anything that says this is a standard? It doesn't even have to be a set date schedule, but some standard in which we could say we can be assured that these field visits would occur? Because we have case law saying good faith is great, but we need some kind of standard to ensure that these mitigation strategies will actually occur. Yeah, well, District Judge McShane noted that the timing, the specific timing, would be left to the discretion of the Forest Service biologists. Right, but we have case law saying that there should be a standard to ensure that we need more than good faith. We need more than the services promised for something this critical. We're talking about this is a mitigation strategy. Without the mitigation strategy, I think there would be a jeopardy finding, or we can infer that. We need to know, and the mitigation strategy will only happen if someone identifies the necessary field conditions. Do we have any standard or schedule in the project proposal that gives us some assurance beyond the Forest Service's good faith that these field visits will occur in a timely fashion? Well, we know what the triggers are to remove the cattle judge or to put the fencing upright, but in terms of the specific timing, again, that's left to the presumed good faith of the Forest Service biologists. Okay, because what I read was very loose. I mean, it said we're going to have informal visits when the opportunity allows, and we're going to try to have formal visits when it's possible, which suggests to me that there could be circumstances under which opportunity and possibility don't arise. And then how do we know that these mitigation strategies will be implemented? Yes, but we have case law that says good faith is great, but we need a standard. So do we have a standard? I'd point out that the Forest Service doesn't want to find itself on the wrong end of an ESA claim or to have to Forest Service biologists follow drought trends in the Klamath Basin. And they have an idea when they want to start getting up there. But I'm not misreading the project description of when these field visits were to occur, correct? You're saying that plus good faith is enough? Well, there is not a specific schedule, but starting on August 1, you have to go every day. Can I ask you, is it your position that climate change had to be discussed in the BIOP, or you seem to be arguing that climate change is so speculative that you really didn't need to address it? I'm sorry, the mic is having an issue. Go ahead, please. Yes, thank you. The BIOP opinion that climate change may... In and out, yeah. I'm just looking at the BIOP, and it appears only to have three parts where it talks about climate change. And in one part it says, you know, climate change will actually be helpful. I mean, I can just look at them. Research by Pike and Marty demonstrated that a moderate intensity of cattle grazing offset the negative climate change effects on wetlands by maintaining hydrologically suitable habitat for the endangered California tiger salamander. That's sort of one time. It says drought may occur periodically, perhaps once per decade. Doesn't really address climate change there. And the only other sentence is, the historical loss of Oregon spotted frog habitats and lasting anthropogenic changes in natural disturbance processes are exacerbated by the introduction of reed, canary grass, non-native predators, and potentially climate change. So that's sort of all that I'm seeing. And as Judge Sut mentioned, you know, the endangered species listing had a lot more information about climate change. So I'm just wondering, why was that not included in the BIOP? There are lots of other documents, the wildlife report, the site management plan, the draft site management plan, that talk about climate change much more robustly than the BIOP. So why is that? And if you're saying it was speculative, then why wasn't it speculative at the time you were preparing these other documents? Well, you know, at the time of the BIOP in 2018, there weren't any studies. The district court was correct that there weren't any studies specific to the frog showing that climate change writ large is a risk. Do we really need a study specific to the frog about climate change? You have studies that say, we expect, modeling predicts that climate change will cause stream flows to decrease in the Klamath Basin, in the Klamath Lake, right, which is the area we're talking about. They say we expect not only this to cause water levels to go down, and they distinguish Klamath from Deschutes, and they say it varies in the Deschutes, but in the Klamath, we predict water levels are going to go down and water temperature is going to rise. Do we really need a study to say how that will affect the frog? And we also have other studies saying your own information says they're very sensitive to water temperature, and they're more likely to be trampled when the water levels are low. I think that a couple of responses, Your Honor. First is, you know, the BIOP takes great weight on the risk of drought, and I think drought is broadly considered an aspect of climate change. You know, the BIOP is a 10-year document. It's going to expire at the end of 2027, and if there's going to be grazing after 2027, it's going to require a new biological opinion and with the best available science at that time. Can I ask you your timing argument? If I look at your draft site management plan, June 3, 2009, so far you're already saying climate change predictions suggest that for surface water-dependent systems like Jack Creek, low water conditions will come earlier in the year, persist longer, and be more extreme. If I look at your wildlife report, September 20, 2017, you're saying climate change is likely to affect sites differently in the Klamath Basin based on the water source. The effects of climate change are expected to be more evident in systems that are dependent on snow melt such as Jack Creek. I mean, I can go on, you know, your document November 28, 2011, the Jack Creek site management plan, you know, you have the greatest threats to the hydrological regime  changes in climate are predicted to reduce winter snowpack and decrease spring runoff from snow melt. This may reduce the amount of water in the Jack Creek system in summer and fall. So, like, I guess I'm having trouble with, oh, in 2018, we didn't have the information to really address climate change, but we did in 2009, 2011, 2017. Well, I would really point the court to the OSF, the Spotted Frog Listing Rule from 2014, which directly preceded, just by four years, the biological opinion. And that document, which listed the frog with protection under the ESA, Fish and Wildlife Service pointed out that it wasn't aware of studies to predict population-level effects or trends on the frog list. Well, I understand they said we can't predict population-level decline, but that doesn't mean they couldn't take the very studies that they rely on that say we expect climate change to reduce water levels and increase water temperature in the Klamath Basin and say – and figure out – just take that into account when doing – analyzing the effects of a project in the Klamath Basin, which is, I believe, what they're required to do under the ESA. I think that's why low water was such an emphasis in the biological opinion. With the mandatory monitoring and the reporting, I think it was appropriately taken into account. It wasn't lost on Fish and Wildlife Service. I mean, they're based in eastern Oregon here. Right, but there's no discussion. I mean, you're asking us to just take it on faith that they did this, but it's not discussed in the biological opinion, and that's what we have to go on. We're not allowed to just assume that the service did this. If you go to the ESA listing, it says, snowmelt-dominated watersheds such as White Salmon in Washington and the Upper Deschutes, Little Deschutes and Klamath River sub-basins in Oregon will likely become transient, resulting in reduced peak stream, spring stream flow, increased winter stream flow, and reduced late summer flow. This is all in the climate change section, and it has a lot of information. You know, a decline in summer stream flow may exacerbate water temperature increases as the lower volume of water absorbs solar radiation. You know, you just have more in this ESA listing than you do in the BiOp, and that's what I'm sort of struggling with. Why is that? I mean, I could keep reading, but I don't want to waste your time. Well, I would say, pragmatically, Judge, the biological opinion did take into account drought and did take into account that it is frequent in the Klamath basin. It seemed to take it into account in a very static and cursory way. I would say, yes, they mentioned drought, and then they say, but there's these low-water implementation strategies. What I don't see is the degree of attention and detail to, you know, as to the conditions of climate change, which seem to be not static, but to be expected to get worse, and to analyze that either in the baseline conditions or in assessing the effectiveness of the mitigation strategies or in the cumulative effects analysis. I mean, anywhere where there would have been a discussion of all this data they have that is reasonably specific to the Klamath basin, to say, taking that into account, how do we assess, you know, this project? It's almost as if, you know, even though it's the same agency that they were just ignoring, and I know you say they cite by reference, but I don't see how just saying, we acknowledge that this ruling exists means we're actually taking into account all of that information and analyzing it. I think it would be an exercising guesswork, Judge. And, you know, and keeping in mind that a biological opinion looks to jeopardy of the species, the organ spotted frog. Well, the regulation, unless I'm misunderstanding it, says jeopardize the continued existence of species in the wild by reducing the reproduction numbers or distribution of that species. And my understanding is if they wipe out the Jack Creek population, even if there's other populations that exist, that would be reducing the numbers or distribution of the frog. I mean, that seems to be pretty plain. Fish and Wildlife didn't believe that the action was going to extirpate the population. It believed that was unlikely given, you know, the recent expanding of the spotted frog population. Right, but that's the whole point here is that they have to explain how they reached that conclusion and that analysis has to properly take into account the best available scientific information that they know. And it seems like they had all this climate-based and specific information about the effects of climate change that they didn't really analyze in their biological opinion, which is very confusing, to be honest. Well, they had information about the climate-based and judged, but the problem is they didn't have information about how that translates to the organ spotted frog. That's the problem. I mean, just having isolated information about snow melt patterns and, you know, rivers, et cetera, isn't enough to just start talking about that when there aren't any studies. I think, you know— But there's some logic that they could have used, right? I mean, they expect these effects on water levels and temperature and then they know certain things about frogs. They know that they're sensitive to water temperature. They know that they're more in jeopardy when the water level is low. So I don't understand. It doesn't seem like a great leap to say one could have the effect on the other. You know, I can tell you right now the Fish and Wildlife Service is working on a spotted frog recovery plan. So, I mean, they're gathering data as we go along, Your Honor, but I think just having information about the climate change factors doesn't answer the question about does that have any impact on the species, which takes me back to the listing rule. And I would also bring up the case—I think it's pretty key here— the Turtle Island case, this Court's 2017 decision, where there was a biological opinion that this Court upheld as not arbitrary and capricious when the biological opinion, with regard to listed turtle species, held that we can't make a climate change effects prediction about these turtles, even though—and I would say in contrast to the Oregon spotted frog, Your Honor— even though with the turtles there were specific studies in Turtle Island about the specific habitat factors, the specific impacts to the turtles from climate change, but nevertheless in that biological opinion, Fish and Wildlife Service said, but that doesn't give us any confidence about effects to populations or how this really affects the turtle species at issue. Here I would say we don't even have those studies about the Oregon spotted frog, whereas they were in existence in the turtle case. Right, but we also have statutes and regulations and case law that says we don't need certainty. They're supposed to be making things based on reasonable predictability. You already have in your own experts, your own research, saying there are these predicted effects. Low water, high—it's just one example. Increasing water temperature is another. And then you also have studies. I'm afraid I'm repeating myself as saying that the frogs aren't sensitive to these things, so I'm not sure why you need a third study to say it's reasonably predictable that decreasing water levels in the Klamath Basin would negatively impact the frogs. Yeah. Again, the Biological Opinion put great emphasis on low water and the problem of drought for this species. Right, which goes back to, then, why is there no standard for when these field visits would occur? Because without a field visit, without someone saying, hey, the water is low, none of these mitigation strategies go into effect. Is that right? Well, you've got strict adherence required, you know, by the Forest Service under the Biological Opinion. I mean, I think you've got an agency that does not want to find itself at the bad end of a lawsuit for an Endangered Species Act take by not doing its job the way it promised it would do it, with diligence. Can I ask you, if we were to vacate the BiOp, would that do more environmental harm? Because then you wouldn't have some of the protections for the list of species that are incorporated in that document. It's difficult to say in a vacuum, I think. I mean, I'm concerned because that may affect these private lands that are some of the prime spotted frog breeding areas. By some estimations, that's about half of the breeding acreage at Jack Creek is privately held lands. And if that's thrown into jeopardy by the BiOp being vacated, I think that would cause the Forest Service and the Fish and Wildlife Service great concern because those private lands would presumably revert under private control and ownership. And there wouldn't be these kind of protections with this 35% utilization. You know, it's been 55%, 60% grazing in the past on those private lands. The bank alteration standard, you know, backed up by the literature about maintaining habitat characteristics would be gone as well. It would be up to the private landowner. So I think that's a problem for the species. What's your best argument of why the BiOp is not arbitrary and capricious because it doesn't really focus more on climate change? Because it does focus on drought. And it takes specific substantive measures to minimize drought causing undue harm on the Oregon spotted frog. While at the same time, you know, not discussing other climate change factors when there's a dearth of studies on what climate change factor. There's many, right? And what is going to apply to the Klamath Basin and how specifically is that going to affect this amphibian, frankly requires studies. The district court noted there weren't any studies about that question. And I think we don't want to forget that the best available science standard is, you know, courts give it great deference here. And I think we have that listing rule, too, just, you know, before the 2018 Biological Opinion where Fish and Wildlife Service said, listen, we want to protect this frog. But as for climate change, that's complicated. And, you know, each species has its own reactions. Some species may be affected positively. Some have mixed effects, some negative effect. And here Fish and Wildlife was clear, we don't know how to predict climate change on populations. So I would say let's not have this biological opinion be a paragon of like a long-range trend forecast, you know, a permanent scientific research document going out 50 years about climate change trends. It's a 10-year document about this proposed action and these proposed pastures. There's only four years left. Fish and Wildlife Service is going to have to account for the best available science, you know, in four years. And I can tell you there has been more science since 2018, and knowledge is evolving about climate change and what that means for various amphibians and other species. If we vacate the biop, do we have to vacate the record of decision? I don't know that that would follow, Judge, because the plaintiffs didn't bring an ESA claim against the rod. They brought NEPA claims and NFMA claims. And they didn't raise any ESA claim against the Forest Service that it, you know, they could have. They could have said, you know, it based on an invalid ESA document and therefore it's arbitrary, but that wasn't one of their claims here. The ESA claim was brought only against the Fish and Wildlife Service biological opinion. Can the service proceed with the project without a valid biop? That would be a very difficult decision for the Forest Service. I don't think I can answer that standing here today, Your Honor. Even if we don't vacate the ROD, they would have to consider it. I think it prompts some serious discussions. Is the trespass survey in the record the one that found the seven occurrences of trespass? It's summarized in the FEIS, Your Honor. Okay, but that's it. That's all we have on that. I think that is. Okay, thank you. And I would point out on that, Judge, that the magistrate, without objection, found that that adequately accounted for unauthorized grazing. There was no objection from the plaintiffs on that, and then that was ordered. If I could just find that citation for you. That's okay. I am not as interested further on that claim. Okay, thank you. Are there any other questions? Judge Gilman? Judge Thong? No, thank you very much. Thank you. Okay, you have two minutes. I'd like to make two points on rebuttal, Your Honors. First, I think it's important for the court to address this issue of whether there was a specific study needed because there was simply not here. The Endangered Species Act doesn't require a specific study. And in the record here, in addition to the listing rule that Your Honors were mentioning, again, we have those declarations of Teresa Simpson with her firsthand knowledge and experience and expertise in Jack Creek, finding the pools shrinking, the cattle trampling. There's arguments in the brief that they didn't need to consider her declarations. Can you respond to those particularly? Well, it's interesting because the listing rule actually cites Ms. Simpson at 3ER476 for her direct observations between the cattle and the frogs. And so Fish and Wildlife Service was a defendant in the prior litigation where that declaration was filed, and Fish and Wildlife Service should have been aware of her extensive experience in this. But there's plenty of- I've been at a point that this is a post hoc rationalization. If they never said-I didn't see anywhere in their biop saying we can't comment on climate change because there are no specific studies showing climate change's effect on the population, right? If that's not in the biop itself, how can we rely on it? Exactly, Your Honor. It's a post hoc rationalization that makes this case even more egregious than the Center for Biological Diversity case v. Zinke that's cited in our briefs. And I just-the last point I want to make is about your question regarding the record of decision. This Court's concerns about the unreliability of the mitigation measures and the short shrift that the agencies page to the climate change issue and the importance of the Jack Creek population all are issues in the NEPA and NIFMA claims as well. This is a grazing scheme as a whole. Grazing Jack Creek- But why haven't you waived that if you never challenged the record of decision on your ESA claim? Your Honor, we did not bring a claim specifically against the Forest Service under the Endangered Species Act. But the same issues that are-some of the same problems with the biop are present in the Forest Service's grazing decision. And so that's why- It might seem like a technicality, but if you didn't bring the ESA claim against the Forest Service, how can we-what authority do we have to vacate the RRD? Your Honors, the main problem is that the grazing scheme in the record of decision relies upon grazing in Jack Creek. And so without take protection under the Endangered Species Act, there's no way that the Forest Service could move forward lawfully with authorizing grazing in Jack Creek. And so for these reasons, we request that the court vacate all of the decisions that are before them. Thank you. All right. Thank you. Thank you to both counsel for your very helpful arguments today. And we are adjourned.
judges: Gilman, KOH, SUNG